26

```
 1    A.       Yes.

 2    Q.       Is that right?

 3    A.       Yes.

 4    Q.       Clearly you have a section of your drawer

 5    for sexual harassment complaints?

 6    A.       Yes.

 7    Q.       Do you know of anyone else at the

 8    institution who has investigated an internal sexual

 9    harassment complaint since 1998 other than yourself?

10    A.       Yes.

11    Q.       Who?

12    A.       His name is Bobby Johnson.

13    Q.       A male Bobby?

14    A.       Yes.

15    Q.       Is he still there?

16    A.       No, he is not.

17    Q.       When did he work there?

18    A.       He did not work there.  He worked at the

19    Chillicothe Correctional Institution.

20    Q.       Okay.  For some period of time, somebody

21    from the outside would come in and investigate it?

22    A.       If I am not available at times, we are

23    across the street from each other, so we help each

24    other out.  He did conduct an investigation for me in
```

27

1   my absence about two years ago, if I am remembering

2   correctly.

3   Q.      Who filed the complaint, do you know?

4   A.      Miranda Joseph.

5   Q.      Is that related to a Daniel Seacrest?

6   A.      Yes, it was.

7   Q.      That is the only one you're aware of that

8   someone else investigated?

9   A.      That I recall.

10  Q.      Okay.  I'm sorry, did you want to add

11  something?

12  A.      I do recall another.  David R. Baker

13  investigated one about a year ago.

14  Q.      Mr. Baker, does he work at Ross?

15  A.      He does.

16  Q.      What's his general duties?

17  A.      He is the institutional investigator.

18  Q.      Okay.  Do you recall which one that was?

19  A.      Hall -- Darren Hall and Bethany Collins.

20  Q.      Is there a reason why you didn't

21  investigate that one?

22  A.      Yes.

23  Q.      What was that?

24  A.      Allegations were made of a physical

28

1    assault.  It was determined that outside charges may

2    be pursued.  And it's the department's policy in any

3    circumstances that could lead to outside charges, the

4    investigator -- the institutional investigator

5    conducts the investigations.

6    Q.          Okay.  Have you gotten rid of any of your

7    investigatory files in this area since you've been

8    there?

9    A.          I am required to keep them for five years.

10   Q.          Okay.  Is that what you've done?

11   A.          Yes.

12   Q.          What do you do with them after five years?

13   A.          We shred them.  We shred them if --

14   Q.          If what?

15   A.          If we are getting rid of them, they are

16   shredded, if I am remembering correctly.

17   Q.          You mean if you remember that you're

18   supposed to shred them after five years?

19   A.          Yes.

20   Q.          So you should have at least five years of

21   all sexual harassment complaints there --

22   A.          Yes, I do.

23   Q.          -- files relating to them?

24               And there may be some other ones that just

1    haven't been shredded?

2    A.        Maybe.

3    Q.        Okay.  Are you aware that there has been a

4    request made for those records in this litigation?

5    A.        Yes.

6    Q.        Have you provided those -- copies of all

7    of those files to counsel for the correctional

8    institute?

9    A.        Yes.

10   Q.        Okay.  You haven't destroyed any of those

11   files since the litigation has been filed?

12   A.        Absolutely not.

13   Q.        Can you give me the name -- you mentioned

14   two names of sexual harassment charges internally

15   that have been investigated.  They related to charges

16   by a Bethany Collins and by a Miranda Joseph.

17   Obviously, there was a charge by Miss Stayner also?

18   A.        Yes.

19   Q.        Any other charges, names of individuals

20   who brought charges like that that you investigated

21   that you can tell me?

22             MS. RABE:  Objection.  You can answer.

23   A.        Of course, this is just strictly going by

24   what I recall off the top of my head.

1    Q.    I understand.

2    A.    Lisa Bethel.

3    Q.    Lisa Bethel?

4    A.    And Dr. Krisher.

5    Q.    That would involve a Dr. Krisher?

6    A.    Yes.

7    Q.    How long ago was that?

8    A.    Within the year.

9    Q.    Okay.  What kind of complaint was that?

10   A.    Sexual harassment.

11   Q.    What was the nature of it?

12   A.    Sexual harassment.

13   Q.    I understand.  More specifically, what

14   supposedly occurred?

15         MS. RABE:  You can answer.

16   A.    Inappropriate comments.

17   Q.    How was that resolved?

18   A.    I don't recall.

19   Q.    Just happened within a year, it's been

20   resolved?

21   A.    It was resolved.

22   Q.    And you don't recall how it was resolved?

23   A.    I don't.

24   Q.    What is Dr. Krisher's job at the

31

1    institution?

2    A.          He's a medical doctor.

3    Q.          Is he still there?

4    A.          Yes, he is.

5    Q.          Has he been disciplined in any way?

6                MS. RABE:  Objection.  You can answer.

7    A.          That is why I said I don't recall.  I

8    don't want to give you inaccurate information.  I

9    don't recall what he received in that.

10   Q.          Okay.  Your testimony is he was

11   disciplined at some point?

12               MS. RABE:  Objection, you can answer.

13   A.          I think.  I can't recall the extent, but,

14   yes.

15   Q.          Lisa Bethel, what is her position?

16   A.          Health care administrator.

17   Q.          Okay.  Any other complaints?  And now

18   we've mentioned, as far as people that have

19   complained, we've mentioned Miranda Joseph,

20   Bethany Collins, Rosa Stayner and Lisa Bethel.

21   A.          Sharon Lewis.

22   Q.          Okay.

23   A.          I'm sorry, I'm sorry, no, that was sexual

24   discrimination, not harassment.  Sorry.

32

1     Q.        Okay.

2     A.        I don't recall.

3     Q.        How many do you think there have been

4     since -- in the last five years?

5     A.        Not many.

6     Q.        Five?  Ten?  Twenty?

7     A.        Maybe the five.

8     Q.        Okay.  What is the deputy warden's name?

9     A.        Which deputy warden?

10    Q.        The second in charge, that starts with an

11    L?

12    A.        Jeff Lisath.

13              L I S A T H.

14    Q.        Didn't he have sexual harassment charges

15    filed against him?

16    A.        That would have been not something I am

17    involved with.

18    Q.        That was pre-1998?

19    A.        I should clarify, if I can.

20              MS. RABE:  I'm going to enter into an

21    objection, but you can answer if you can.

22    A.        The position of correction warden's

23    assistant I've had since 1998.  I didn't receive the

24    assignment as EEO chairperson until 2004.

1    Q.        Okay.  And you're saying this was before

2    2004?

3    A.        It must have been.

4    Q.        Okay.  You've heard of it, but you weren't

5    involved in it?

6    A.        Right.

7    Q.        Okay.  Who would have been the person

8    involved in it in your similar position at that time?

9              MS. RABE:  Objection.  You can answer.

10   A.        Robin Ware.

11   Q.        That's a female?

12   A.        Yes.

13   Q.        She is still there?

14   A.        No.

15   Q.        When did she leave, do you know?

16   A.        I think 2004.

17   Q.        Do you remember what her position was?

18   A.        Corrections Warden Assistant 2.

19   Q.        Okay.  Do you keep any records of outside

20   charges, sexual harassment or any lawsuits filed

21   against Ross Correctional Institute?

22   A.        It would not be my responsibility.

23   Q.        That is what I am asking.  You

24   individually as opposed to someone else?

34

1   A.        No.

2   Q.        Okay.  Do you know if anyone at the

3   institution, at Ross Correctional, who keeps copies

4   of such things, records of such things?

5   A.        I do not.

6   Q.        What happens, if you know, when a charge

7   is filed with the EEOC or the OCRC and/or a lawsuit

8   is filed against the Ross Correctional Institute,

9   it's not dealt with by anybody internally?

10            MS. RABE:  Objection.  You can answer.

11  A.        We're required to do what is called a

12  position statement for the warden.  The warden is

13  required to provide a position statement answering

14  the charges, to my understanding.  And that's not

15  done by my -- by me.

16  Q.        Okay.  Position statement for who, for

17  some other part of the state?

18  A.        For the Department of Rehab and

19  Corrections.

20  Q.        Is somebody there, somebody in particular

21  in the department that you're in contact with?

22  A.        Not that I contact with.

23  Q.        That the warden would have -- that the

24  warden would have contact with?

35

1                    MS. RABE:  Objection.  You can answer.

2       A.          I think I'm not understanding.

3       Q.          I'm thinking of a name of a person that

4       would particularly be the one in that interaction

5       position between the warden and the department of

6       corrections when an outside charge or a lawsuit is

7       filed.

8       A.          Again, Marsha Kent.

9       Q.          It would typically be Marsha Kent?

10      A.          Or someone from that office.

11      Q.          And that is the -- I'm sorry, you told me

12      this before.

13      A.          Bureau of Staff Enrichment.

14      Q.          For the Southern --

15      A.          EEO section.

16      Q.          -- for the Southern District of Ohio or

17      southern portion of Ohio?

18      A.          Well, it's for the whole --

19      Q.          But Marsha Kent, does she handle -- she

20      handles Ross, but you don't know what else she does?

21      A.          I don't.  Right.

22      Q.          Okay.  How recently have you talked to

23      Marsha Kent?

24      A.          I arranged for training for my committee

36

```
 1      last summer and talked with her requesting that she

 2      come to conduct training probably June or July of

 3      last year.

 4      Q.          Okay.  You haven't talked to her since

 5      then?

 6      A.          No.

 7      Q.          Okay.  Have you talked to anybody else in

 8      her office since then?

 9      A.          George Lopez.

10      Q.          Okay.  When did you last talk to him?

11      A.          He conducted the training.

12      Q.          You haven't talked to him since then?

13      A.          Not that I recall.

14      Q.          What type of training are you talking

15      about?  What was the topic?

16      A.          Committee training trends across the

17      country and that type of thing.

18      Q.          EEOC trends in general, is that what

19      you're saying?

20      A.          Yes, yes.

21      Q.          And I guess I just want to focus, let's

22      say, from 2007 forward.

23      A.          Okay.

24      Q.          Has there been any extended period of time
```

37

1    when you were not working at Ross that you were off

2    for something other than a vacation or something like

3    that?

4    A.          No.

5    Q.          You've sort of answered this question

6    before when you were talking about your post high

7    school education.  But do you have any formal

8    education in the criminology, penology, prison

9    administration, anything like that?

10   A.          Outside of training I receive through the

11   Department of Rehab and Corrections, seminars,

12   training --

13   Q.          Yes, let's focus first on the outside

14   concept.  Any formal outside training in those areas?

15   Basic, penology, criminology, that type of thing?

16   A.          Not outside of the department or seminars,

17   conferences, those types of workshops.

18   Q.          What types of seminars would you say

19   you've taken that fit into that area?

20   A.          Many.  Too many to even recall.

21   Q.          And what I'm trying to -- maybe I'm not

22   doing it very well, but I'm trying to separate your

23   training relating to the specific duties of your job

24   with just broader training relating to the prison

38

1    system and how the prison system functions and goals

2    of the prison system, that type of thing.  You're

3    saying you've had some of that latter training?

4    A.       Yes.

5    Q.       Is that something you would typically have

6    training in every year?

7    A.       Yes, yes.

8    Q.       Have you had any specific training dealing

9    with the concept of female correction officers in a

10   male prison environment?

11   A.       I don't recall specific training.

12   Q.       Are you aware of issues that can be

13   created because of that concept of the female

14   corrections officers in the male prison environment?

15   A.       Certainly.

16   Q.       What type of training can arise because of

17   that?

18   A.       I'm not recalling issues from training.

19   Q.       Okay.  Or your experience, what type of

20   issues?

21   A.       Yes, certainly.  There are issues that are

22   inevitable with male offenders and female corrections

23   officers.  It's something that can be uncomfortable.

24   Q.       There can be issues of respect between the

39

1    male inmates and the female prison guards?

2    A.        Certainly.

3    Q.        And if that respect gets undermined, it

4    can affect negatively the female corrections

5    officer's ability to do her job?

6    A.        Certainly.

7    Q.        For instance, if there's pornography all

8    over the prison and rules relating to it are not

9    enforced, that may impact the female corrections

10   officer's authority over inmates?

11            MS. RABE:  Objection.

12   A.        It's the corrections officer's job to

13   remove the pornography and to enforce the rules.

14   Q.        And if those rules aren't enforced, among

15   other things, they can certainly undermine the female

16   corrections officer's position?

17   A.        I guess if the officer chooses not to

18   enforce the rules, yes.

19   Q.        Or if the male officer, for instance,

20   chooses not to enforce the rules?

21            MS. RABE:  Objection.  You can answer.

22   A.        Yeah, if the rules are not enforced, yes,

23   certainly it can undermine anyone.

24   Q.        And I don't know, but I'm just assuming

40

1  that there's more female pornography in the male

2  prison system than there is male pornography?

3          MS. RABE:  Objection.  You can answer.

4  A.      I can't speak to that.

5  Q.      You don't know?

6  A.      I don't know.

7          MS. ESCHBACHER:  Off the record.

8                  (Recess taken.)

9  Q.      I want to get a quick understanding of the

10  prison administration at the level that you're at.

11  And I think you've already explained to me a bit, you

12  report directly to Warden Sheets, is that correct?

13  A.      Yes, I do.

14  Q.      I think you said there were two deputy

15  wardens directly under Warden Sheets, is that

16  correct?

17  A.      Yes.

18  Q.      Who are they?

19  A.      Carol Upchurch.

20  Q.      Okay.

21  A.      Jeff Lisath.

22  Q.      There's another lady whose name has come

23  up in this, Michelle Ivey.  Do you know her position?

24  A.      Currently, she is the unit management

41

1    administrator.

2    Q.          Who would she report to, if you know?

3    A.          Jeff Lisath.

4    Q.          And what would she do as unit management

5    administrator, if you know?

6    A.          She supervises all of the unit functions

7    at the facility.

8    Q.          The units being --

9    A.          Offender housing units.

10   Q.          Okay.  Is there someone -- and maybe it's

11   within the duties that you described, but is there

12   someone at the prison who is, for lack of a better

13   word, sort of the human resource person there other

14   than yourself?  Because, obviously, it sounds like

15   you have some of those duties?

16   A.          Sandy Hinton.

17   Q.          Anyone else like that?

18   A.          There's a whole HR department.

19   Q.          Sandy Hinton is the one that supervises

20   that?

21   A.          Yes, senior management analyst,

22   specifically, yes.

23   Q.          Okay.  And you mentioned the one lawsuit

24   that you were involved in, personal lawsuit.  Any

42

1    other lawsuits that you have been involved in other

2    than that one?

3    A.          No -- yes, by an offender.  I've been

4    named in suits by offenders.

5    Q.          Okay.  By someone in -- inmates, is that

6    what you're talking about?

7    A.          Yes.

8    Q.          I take it from what you said before,

9    you've never given a deposition or anything like that

10   in one of those suits or have you?

11   A.          I went to federal court in Colorado for an

12   offender, and it was in about 1996.  We were there

13   for four days.  And we met with a lot of the

14   attorneys.  And I don't recall a formal deposition

15   taking place, but my role in it was very minor.

16   Q.          Okay.  That would be when you were at the

17   Southern Ohio facility?

18   A.          Yes, it was.

19   Q.          And do you think you were a defendant in

20   that?

21   A.          It wasn't exactly a defendant.  The

22   offender was challenging his extradition to the State

23   of Colorado.

24   Q.          Okay.  I understand.  Anything else like

43

1    that other than what you have mentioned, anything

2    else that sticks in your mind?

3    A.        No.

4    Q.        So there would be no other deposition or

5    something like what we're doing today?

6    A.        No.

7    Q.        But what you're saying is it's in the back

8    of your mind that you have been named as an

9    individual in some lawsuits through the years by

10   inmates?

11   A.        Yes.

12            MR. COCO:  Okay.  Let me show you a

13   document and we'll go from there.

14            (Plaintiff's Exhibit No. 1 was marked for

15   identification.)

16   Q.        I'm going to hand you a document we've

17   marked as Plaintiff's Exhibit No. 1.  That, as I

18   understand it, is a copy of the general responses

19   that the defendants, other than Officers Hughes, made

20   to the discovery request in the case.  And I'm

21   wondering if you have seen this before?

22   A.        No, I have never seen this.

23   Q.        Okay.  Why don't you take a quick look

24   through it.  I just want to make sure that that is

44

1     the case, you're not the person that signs off on

2     this, it's Warden Sheets.  But I want to make sure

3     that you did not have any involvement, and I think

4     that's what you're saying in the responses to this.

5     So take a quick look at it first, if you would.

6              I take it none of that looks familiar, the

7     questions or the responses to them?

8     A.        No, I have never seen this.

9     Q.        Okay.  That is fine.  You do recall at

10    some point being asked for -- to gather materials

11    related to sexual harassment complaints in the past?

12    A.        Yes.

13    Q.        And providing them to counsel or providing

14    them to someone?

15    A.        Yes.

16    Q.        Okay.  And you understood it had something

17    to do with this lawsuit?

18    A.        Yes, it did.

19    Q.        And other than those files that you

20    gathered relating to this lawsuit, any other files

21    that you gathered relating to the lawsuit?

22    A.        No.

23             MR. COCO:  Okay.  Now, I'm going to focus

24    more specifically with what brings us here today.

45

1    And I'm going to give you a couple of documents that

2    I think we're going to be referring to periodically

3    that may help us if we get them marked as we're going

4    through it here, two sets of documents in particular.

5              (Plaintiff's Exhibits 2 and 3 were marked

6    for identification.)

7    Q.        Let me hand you first what has been marked

8    as Plaintiff's Exhibit 2, and also what is marked

9    Plaintiff's Exhibit No. 3.  And I think we're going

10   to be periodically referring to both of these

11   documents to help us get through this stuff hopefully

12   a little quicker.

13             Lisa, I'm sorry, I only have one copy

14   here, but I think this is all stuff that you have

15   seen.

16             MS. ESCHBACHER:  If I know what it is --

17             MR. COCO:  And we'll be describing it.

18             (Plaintiff's Exhibits No. 2 and No. 3 was

19   marked for identification.

20   Q.        Plaintiff's Exhibit No. 2, I don't know if

21   you have seen it in that form or not, that is part of

22   the response that Miss Stayner made to a discovery

23   request in the case.  And the reason I'm giving you

24   that is that it has extensive notes by Miss Stayner

46

1    about certain incidences and certain discussions with

2    you that I may direct you to to help you if we get to

3    a certain area to see if you remember this and help

4    us discuss it.  Do you recall seeing this in this

5    form at least, exhibit 2?

6    A.          Not in this form, no.

7    Q.          Okay.  But I think as you're paging

8    through it, you're thinking, yeah, I've probably seen

9    some of these pages?

10   A.          I've never seen this before and would have

11   no reason to, because that doesn't involve me.

12   Q.          Okay.  You're talking about Page 1 of

13   exhibit --

14   A.          Page 1.

15   Q.          Okay.

16   A.          This, I have in my file.

17   Q.          Page 2?

18   A.          Page 2.  However, it was conducted by a

19   member of my committee, a previous member of my

20   committee and not myself.

21   Q.          I'm not intending to go through all those

22   pages and see if you seen them or not.

23   A.          Okay.

24   Q.          I'm just going to point you to some

47

1    information in those pages, and we'll talk about it.

2    But I want you to have that in front of you to use

3    while we're going through some of this, just because

4    I think it will make it easier.

5             And I'm also going to hand what you I

6    think is Plaintiff's Exhibit 3.  And why don't you

7    take a few minutes to look through that.

8             In essence, as I understand it, you were

9    the one that investigated the initial charge by

10   Miss Stayner relating to the internal charge by

11   Miss Stayner relating to Sergeant Hughes, is that

12   right?

13   A.        Yes, is it is.

14             MR. COCO:  Exhibit 3 is basically what I

15   understand to be sort of the file relating to the

16   hearing and the investigation in this matter, the

17   initial investigation, initial hearing in the matter,

18   which was produced by the state in discovery.  And

19   why don't you take a quick look through.  It's

20   obviously very extensive, but, again, I think we're

21   going to be referring to it in various ways.  So why

22   don't you take a quick look through it and see if, in

23   general, you think that's what that is.

24             MS. ESCHBACHER:  Mark, just so we don't

48

1    have to make copies, I see Bates stamp numbers.  If

2    you give me those numbers, I can pull them and know

3    what they are.

4              MR. COCO:  Good idea.  Exhibit 2,

5    Plaintiff's Exhibit 2, is the attachment to

6    Miss Stayner's interrogatories responses, and

7    individual pages are numbered 1 through 100.

8              MS. ESCHBACHER:  Okay.

9              MR. COCO:  Plaintiff's Exhibit 3 is

10   material from the production by the state defendants,

11   and is Bates number 304 through 385.  And I think

12   that's all consecutive.  I don't think there's any

13   pages left out.

14             MS. ESCHBACHER:  Okay.  That is great.

15             MR. COCO:  Exhibit 1, I don't know if you

16   were here or not, we identified, and that's just the

17   responses to the interrogatories made by the state

18   defendants.

19             MS. ESCHBACHER:  Okay.  Thank you.  I was

20   going to ask if I missed an Exhibit 1 when we started

21   with 2 and 3.

22             MR. COCO:  Yes, you did.

23   Q.        Is that a fair representation of

24   Exhibit 3, it appears to be the file relating to the

49

1    investigation of Miss Stayner's complaint and

2    relating to Sergeant Hughes?

3              MS. RABE:  Objection.  But you can answer.

4    A.         I can't speak to the documents that were

5    not what my involvement was.  But I can speak to the

6    documents that began with 308.

7    Q.         Okay.  So you're saying you created some

8    of those documents?

9    A.         Some of those, yes.

10   Q.         And you had other people involved in

11   talking to some people, that type of thing also?

12   A.         No, I conducted the investigation solely.

13   Q.         Okay.  Is there something in there that

14   you think is -- let's focus on it that way.  Is there

15   something in there, in Plaintiff's Exhibit 3, that

16   you think is not related to the investigation that

17   you headed up?

18             MS. RABE:  Objection, but you can answer.

19   A.         It was -- it is not our policy or practice

20   that I would be involved with this.

21   Q.         You're talking about the first page?

22   A.         Page 304.  This would be after my

23   investigation is complete.  So I couldn't speak to

24   that.

1    Q.          Let's see if we can add clarity to the

2    record.  I think I understand what you're saying.

3    Once this gets to the hearing phase, you're no longer

4    involved, is that what you're saying?

5    A.          Unless called as a witness.

6    Q.          In hearing, okay.  To the extent that

7    there is something in Exhibit 3 that relates directly

8    to a hearing notice or something that occurred at a

9    disciplinary hearing, that wouldn't necessarily be

10   part of your investigation?

11   A.          Correct.

12   Q.          Okay.  For instance, in 305, the next one

13   is a pre-disciplinary conference notice, which you

14   may have had some involvement in preparing.  But what

15   you're saying, that really wasn't part of your

16   investigation?

17   A.          I would have no involvement in preparing.

18   Q.          The way to clarify this is, again, if

19   we're talking about anything relating to the hearing,

20   you wouldn't have been involved in the disciplinary

21   hearing or the pre-disciplinary hearing other than as

22   a witness.  Other than that -- other than that, the

23   things in Exhibit 3 appear to relate to your

24   investigation?