**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| | : | |
| **ROSA STAYNER,** | : | **Case No. 2:09-CV-752** |
| | : | |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **MAGISTRATE JUDGE KEMP** |
| **OHIO DEPARTMENT OF** | : | |
| **REHABILITATION AND** | : | |
| **CORRECTIONS, ET AL.,** | : | |
| | : | |
| **Defendants.** | : | |

## <u>OPINION AND ORDER</u>

### I. INTRODUCTION

This matter is before the Court on the Motion for Summary Judgement of Defendant
Ohio Department of Rehabilitation and Corrections (ODRC).  (Dkt. 57.)  Plaintiff Rosa Stayner
brings this lawsuit against ODRC, Ross Correctional Institute (RCI), and three individuals,
Warden Michael Sheets, ODRC Director Ernie Moore, and Corrections Officer Alfred Hughes.
Stayner alleges that the Defendants violated her rights under Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000 *et seq.* (Title VII) by subjecting her to sexual harassment and retaliation
(Count I).  Further, she alleges that Defendants Sheets, Moore, and Hughes violated her rights
under the First and Fourteenth Amendments to the United States Constitution, enforceable
through 42 U.S.C. § 1983, by denying her the rights to freedom of speech and equal protection
(Count III).  For the following reasons, the Motion is **GRANTED** in part and **DENIED** in part.

## II. BACKGROUND

### A. Factual Background

### 1. Organizational Structure

Stayner has been employed at Ross Correctional Institute (RCI) since 1998, and has been a corrections officer at RCI since 2002. Corrections officers are the lowest-ranking employees on the "custody" side of a correctional institution. They have a number of responsibilities, which include some of the following: security; conducting cell searches and inmates searches; and ensuring that rules and regulations are followed. They report to lieutenants, who then report to captains. The captain reports to the major, who reports to the deputy warden, and then the warden.

On the "operational" side of the correctional institutions, sergeants are the lowest-ranking employees. In general, they are responsible for overseeing sanitation in the housing units, completing conduct reports, and coaching other staff members. They report to unit managers, who report to the unit manager administrator, and then the deputy warden, and then the warden.

### 2. October 2007 Incident

In October 2007, Stayner was assigned to work in a housing unit known as the "J-Dorm." At the same time, Alfred Hughes was assigned as a Sergeant in the unit. On October 8, 2007, Hughes made a comment to Stayner about her breasts; he asked her about her "big boobs" in front of the inmates. In response, Stayner took Hughes aside and told him that such comments were unacceptable. A day later, Hughes waved Stayner into his glass office and showed her

pornographic images on his computer while an inmate was present.[1]  Hughes made comments to Stayner as he flashed through the pictures: "How do you like these boobs?  They're bigger than your boobs;" and "We'd like to get you in this position."  Meanwhile, the inmate laughed.  When Stayner asked Hughes to remove the images, he laughed as well.

On October 12, 2007, Stayner reported the incident to her union representative, Barry Crabtree.  Crabtree and Stayner spoke with Captain Michael Bane, and then all three spoke with Michelle Finney, an EEO representative.  In writing her report about the 2007 incident, Stayner reported a similar incident that occurred in 2005.[2]  Then, Hughes commented to Stayner that he "had something for her to suck on," while indicating his genital area.  He also showed her pornography on his computer while in the presence of inmates.  Stayner told him that she "would put his balls up into his throught [sic] if he did not get out of [her] face."  Stayner did not report the incident because she feared retaliation.

The incidents had a profound effect on Stayner.  She had worked hard to gain the respect of inmates, and she felt that Hughes's treatment of her undermined her credibility and authority. In a sense, it enabled the inmates to mimic Hughes.  As she stated: "[W]hen you have a sergeant, someone with authority, to put out porn where inmates can see it, and allow that to happen in front of inmates, it's telling the inmates it's okay to put porn up.  It's telling inmates it's okay to sexually harass female officers, and that infuriated me."  After the incident, inmates began

[1]The pictures included images of women with large breasts; women with bows and arrows; women bent over with tattoos; naked women with "short little fat guys;" women naked on the beach; and "great big fat women sitting in windows."

[2]Also in 2005, Stayner filed a report that she had received an intra prison phone call on October 29 in which the caller asked: "Are you going to let me lick that sweet pussy?"  She believed that the call was from Hughes, but it is not clear if the report was investigated.

3

displaying pornography to her, and told her that Hughes had instructed them to do so.  Nearly every prison official deposed in this case, including Warden Sheets, conceded that Hughes's conduct impaired Stayner's ability to do her job.

Furthermore, Stayner alleges that this conduct was not atypical.  Bethany Collins, another female corrections officer at RCI, had a similar interaction with Hughes.  In 2006, Hughes showed her pornographic images on his computer in front of inmates.  Collins testified that she believed that the conduct threatened her safety because exploiting her sexuality put her in jeopardy of sexual assault by the inmates or fellow officers.  She did not report the incident, however, because she feared retaliation.  Collins testified that her concerns turned out to be true, because in 2009 Officer Darren Hall attempted a forcible sexual assault.  The incident was investigated, however, and RCI found that both Hall and Collins were lying about what occurred.  Thus, the investigator concluded that Collins's allegations about the assault could not be substantiated.

### 3. ODRC Investigation

At the time of the incident, Michael Sheets was the warden at RCI.  Finney, the EEO representative, seized Hughes's computer and interviewed individuals who potentially had knowledge of the events.  None of the individuals interviewed claimed to have witnessed the alleged incidents, and the inmate in the office testified that the women in the computer images were "in swimsuits or skimpy outfits, none nude."  The RCI investigator, David Baker, found pictures on Hughes's computer that depicted nude women, and two videos that he found to be

4

"pornographic."[3]  The computer forensics specialist, Thong Do, analyzed the computer hard drives used by Hughes and found inappropriate images and videos.  Some of these images involved nudity.  Stayner identified the images as the ones she had seen in Hughes's office.

Warden Sheets reviewed the investigative reports and directed Michelle Ivey, labor relations officer, to set up a disciplinary hearing.  ODRC asserts that this was Hughes's first offense for this infraction.  According to the Standards of Employee Conduct, an employee could not be terminated for a first time offense of sexual harassment.  The punishment for such an infraction was a two-day suspension.  After consulting with the Central Office, Sheets charged Hughes with violations of Rule 24, interfering with an official investigation, and Rule 37, taking actions that could interfere with the ability of another employee to effectively carry out his duties.  Both Rules carry the possibility of termination for a first offense.

Hearing testimony was presented on December 10 and 17, 2007.  The hearing officer prepared a report finding that there was cause to discipline Hughes under Rules 24 and 37. Sheets recommended to Central Office that Hughes be terminated, and Central Office agreed. The termination was effective on January 17, 2008.

After he was terminated, Hughes contacted Stayner on an internet dating website, singlesnet.com.  He sent her an email saying that he was interested in her, and included photographs of himself.  Stayner reported the contact to Finney, the EEO representative.

The union filed a grievance on Hughes's behalf on January 22, 2008.  After a hearing, the grievance process proceeded to mediation.  According to ODRC, the mediator indicated to the

---

[3]The videos depicted women inserting items into their vaginas, including lit cigars and rubber duckies.

5

parties that he did not believe that an arbitrator would uphold Hughes's removal, and so ODRC reached a settlement agreement with Hughes.  He was returned to work, but demoted to the rank of corrections officers, and received no back pay.  The time between his removal and his reinstatement—four months—was treated as a "time served" suspension.  Hughes was also subject to a 2-year Last Chance Agreement, under which he faced immediate removal if he violated either of the rules he had been charged with in his removal, or if he violated Rule 13, which is the rule prohibiting sexual harassment.

Stayner alleges that agreement was reached so that Hughes would remain quiet about the culture of pornography and sexual harassment that Warden Sheets permitted to flourish at RCI. She testified to numerous examples of pornography on male staffers computers and cell phones, as well as unreported incidents of sexual harassment.

### 4. Stayner's Disability Leave and Return to Work

Stayner was diagnosed with post-traumatic stress disorder, depression, and anxiety as a result of the October incident.  On December 21, 2007, she went on disability leave.  She did not return to work at RCI until her doctors cleared her to do so in September 2008.

On February 9, 2009, Stayner became upset because she was scheduled for a training session with Hughes.  She felt very uncomfortable about the idea of being in class with him, and when she told Finney about her discomfort, she was told that she could not be placed in another class.  Warden Sheets was at the training session, but took no steps to resolve the situation because he believed that Stayner would be fine.

On September 25, 2009, Stayner filed a complaint with RCI about being removed from her Return to Work (RTW) assignment.  In August 2009, Stayner had broken her arm, and upon

her return to RCI had entered the RTW program. This program allows employees who are returning to work with physical injuries to work in positions with limited inmate contact while they complete their recovery. Both management and union members determine their assignments, but ODRC has the right to change an employee's assignment.

Stayer was initially placed in RCI's Camp, but was later reassigned to the mailroom. She asserts that this reassignment was retaliatory. ODRC responds that during Stayner's time in the RTW program, another RCI employee also entered. His permanent post was in RCI's Camp, and so the union president decided to place him in that post for his RTW program stint. As two employees in the RTW program cannot be placed in the same work area, the union president made the decision to move Stayner to another location.

While participating in the RTW program, Stayner attended a training session on the use of force and unarmed self defense. Participants of the RTW program, however, are not permitted to take part in physical skills training. The instructor removed her from the class and filed an incident report. Stayner received a written reprimand, and the labor relations officer recommended discipline. Stayner filed a grievance, and the reprimand was changed to corrective counseling, which is not a form of discipline.

### 5. Stayner's Suicide Threat

On October 13, 2009, Stayner made a threat to commit suicide to a fellow corrections officer, Sue Kern. Stayner asserts that the comment was made in jest—"what do they want me to do, shoot myself"—and in response to the retaliatory treatment she received at RCI as a result of her reports on Hughes. Nevertheless, Kern alerted a supervisor, and Stayner was admitted to the hospital for several days. Warden Sheet was concerned that Stayner might attempt suicide

on RCI's grounds or that a murder/suicide situation could develop. After consulting several

other employees and ODRC's legal counsel, Warden Sheets placed Stayner on administrative

leave in order to determine her fitness for duty and to ensure the safety of Stanyer and other RCI

employees. An independent medical examination took place on November 11, 2009, and the

doctor cleared Stayner to return to work. Her personal doctor cleared her return on November

24, 2009. On December 4, 2009, Stayner returned to work.

### B. Procedural Background

Stayner filed suit against ODRC, RCI, and three individuals, Warden Michael Sheets,

ODRC Director Ernie Moore, and Corrections Officer Alfred Hughes. ODRC, RCI, Sheets, and

Moore are collectively referred to as the Defendant Employers. Plaintiff sued Defendant

Employers, alleging a violation of federal law for employment discrimination on the basis of sex

under of Title VII and codified in 42 U.S.C. § 2000e *et seq*. (Count I); violation of Ohio law for

employment discrimination on the basis of sex under Ohio Rev. Code § 4112.99 ("§ 4112")

(Count II); and violation of her First and Fourteenth Amendment rights under 42 U.S.C. § 1983

(Count III). More specifically, Plaintiff alleges that Defendant Employers failed to take proper

action in response to her allegations of sexual harassment against Defendant Hughes. This Court

dismissed Count II as to all Defendant Employers and Count III as to Defendants ODRC and

RCI.

ORDC, RCI, Sheets, Moore, and Hughes filed a Motion for Summary Judgment on April

4, 2011, seeking summary judgment on all remaining claims. The Court has considered the

memoranda and exhibits filed and the arguments submitted by the Parties at oral argument, and

the matter is now ripe for a decision.

8

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388-89 (6th Cir. 1993). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. But the non-moving party "may not rest merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e)(2); *see also Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co*., 8 F.3d 335, 339–40 (6th Cir. 1993). When ruling on a motion for summary judgment, a district court is not required to sift through the entire record to drum up facts that might support the nonmoving party's claim. *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Instead, the Court may rely on the evidence called to its attention by the parties. *Id*.

## IV. LAW AND ANALYSIS

### A. Count I: Sexual Harassment and Retaliation

#### 1. Sexual Harassment

First, Stayner alleges that the Defendants violated her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* (Title VII) by subjecting her to sexual harassment. In order to establish a prima facie case for sexual harassment, Stayner must show the following: (1) she was a member of a protected class; (2) she was subjected to harassment, either through words or actions; (3) based on sex; (5) the harassment had the effect of unreasonably interfering with her work performance or creating an objectively intimidating, hostile, or offensive work environment; and (5) there exists some basis for liability on the part of the employer. *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008). In order to succeed on her claim, Stayner must show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment." *Gold v. FedEx Freight East, Inc.*, 487 F.3d 1001, 1010 (6th Cir. 2007). The conduct in question must be judged by both an objective and a subjective standard: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993); *see also Williams v. General Motors Corp.*, 187 F.3d 553, 566 (6th Cir. 1999) (stating that "the focus of the objective/subjective inquiry should remain on (1) whether a reasonable person would find the environment objectively hostile, and (2) whether the plaintiff subjectively found the conduct 'severe or pervasive'") (internal quotations omitted).

Of course, this approach is not susceptible to a "mathematically precise test." *Harris*, 510 U.S. at 22. Courts should look at the totality of the circumstances, rather than analyze the alleged comments and conduct as independent events. *See id.* at 23.  Even if a plaintiff proves the aforementioned elements, however, an employer is not necessarily liable under Title VII.  If the took action after an employee complained, the employer may not be held liable for sexual harassment if the action is adequate and effective. *See Wathen v. General Electric Co.*, 115 F.3d 400, 407 (6th Cir.1997).

The Defendants argue that Stayner's claim must fail for two reasons.  First, they argue that the conduct alleged by Stayner was neither severe nor pervasive.  Second, they argue that Stayner cannot show that ODRC is liable for the alleged harassment.

### a. Severe or Pervasive

In order for sexual harassment to be actionable, "it must be sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive work environment." *Meritor Savings Bank, FSB v. Vinson*, 466 U.S. 57, 67 (1986) (internal quotation marks, alterations, and citations omitted).  To determine the pervasiveness of workplace harassment, courts should consider, among other things, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Harris*, 510 U.S. at 23.

The alleged conduct in this case severely impacted Stayner's ability to do her job. Hughes, her co-worker, showed her pornographic images in front of an inmate.  When Stayner asked Hughes to stop, he laughed and refused.  This behavior undermined Stayner's authority in

11

the workplace, because it demonstrated to the inmates Hughes did not respect her. This type of

undermining behavior is particularly egregious in a prison setting. Stayney's success at her job

depended on her ability to garner the respect of the inmates. If her co-workers harassed her in

front of the inmates, her chances of being able to do her work significantly diminished. The

defendants conceded this very point in their depositions. Nearly every prison official deposed in

this case, including Warden Sheets, conceded that Hughes's conduct impeded Stayner's ability

to do her job.[4] Accordingly, the alleged conduct creates a material question of fact as to whether

the conduct was sufficiently severe or pervasive to give rise to a violation of Title VII. *See*

*Williams v. General Motors Corp*., 187 F.3d 553, 567 (6th Cir. 1999) (stating that the plaintiff

"need only show that the harassment made it more difficult to do the job" in order to establish

that her work environment was hostile) (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345,

349 (6th Cir. 1988)); *see also Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 274

(6th Cir. 2009) (holding that the alleged conduct— including insulting language and images,

demeaning conversation, and ignored complaints—created a question of material fact as to

whether the harassment made it more difficult for the plaintiff to do her job).

Defendants focus their arguments too narrowly, and insist that the acts of a male making

sexually tinged comments and showing pornography to a female co-worker are not severe and

pervasive. In focusing solely on the acts as separate and discrete incidents, the Defendants fail to

---

[4]Question:            Do you think a guard displaying pornography to inmates breaks
down the control and authority of the institution?
Warden Sheets:    Yes.
Question:            Do you think a guard displaying pornography to inmates
undermines the authority of other guards?
Warden Sheets:    It undermines their authority.  (Sheet Depo. 26)

consider the totality of the circumstances. *See Williams*, 187 F.3d at 562 ("[T]he issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile work environment case, but whether-taken together-the reported incidents make out such a case."). Considering the work environment as a whole, and the serious impact the incidents had on Stayner's work, the accumulated effect indicates that a rational trier of fact could find that Stayner was subjected to a hostile work environment. Indeed, Defendants conceded as much at oral argument.

### b. Liability

### i. Legal Standards for Vicarious Liability

Even if an employee has established a hostile work environment, he or she must prove employer liability. In order to establish employer liability, "the harassed employee must show that the employer both (1) knew or should have known of the harassment and (2) failed to take prompt and appropriate corrective action." *McCombs v. Meijer, Inc.*, 395 F.3d 346, 353 (6th Cir. 2005) (quoting *E.E.O.C. v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 518 (6th Cir. 2001).

The standards for employer liability differ if the alleged harasser is a co-worker or a supervisor. If the allegations involve a co-worker and the employer has responded, then "the employer will only be liable 'if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.'" *Mccombs*, 395 F.3d at 353 (quoting *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 873 (6th Cir. 1997). In essence, the standard for co-worker harassment is negligence. *See Collette v. Stein-Mart, Inc.*, 126 Fed.Appx. 678, 684 n. 3 (6th Cir.2005) (noting that *Blankenship*'s suggestion that "mere negligence" is insufficient to establish employer liability was overruled by *Ellerth/Faragher* and

13

suggesting that, post-*Ellerth/Faragher*, "an employer may be held liable when its remedial response is merely negligent, however well-intentioned"); *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829 (6th Cir.1999) (holding that, post-*Ellerth/Faragher*, the standard for co-worker harassment is negligence, but applying *Blankenship* to define negligence as an employer response that "manifests indifference or unreasonableness in light of the facts").

If the allegations involve a supervisor, the Supreme Court distinguishes between supervisor harassment that includes an adverse employment action and supervisor harassment that does not.  If the conduct includes an adverse employment action, such as discharge, demotion, or undesirable reassignment, then the employer is strictly liable.  *Collette v. Stein-Mart, Inc.*, 126 Fed. Appx. 678, 682 (6th Cir. 2005).  If the conduct does not involve an adverse employment action, then the employer is strictly liable but may raise a two-pronged affirmative defense: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 137 (2004) (quoting *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

### ii. Whether Hughes was Stayner's Supervisor

The parties dispute whether Hughes was in fact Stayner's supervisor at the time of the alleged conduct.  The Supreme Court has not defined supervisor under Title VII, and this Court has held that a supervisor is "an individual who serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment."  *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir.1994).  The Second Circuit has

14

addressed this issue, and found that for purposes of Title VII, liability may be imputed to an employer for the actions of individuals in charge of an employer's work days and work assignments, even if the employer has not designated that individual as a supervisor or manager. The central consideration is  "whether the power—economic or otherwise, of the harassing employee over the subordinate victim given by the employer to the harasser—enabled the harasser, or materially augmented his or her ability, to create or maintain the hostile work environment."  *Mack v. Otis Elevator Co.*, 326 F.3d 116, 125 (2d Cir. 2003).

This definition, as well as the Sixth Circuit broad definition encompassing "control over . . . conditions of employment," is consistent with the E.E.O.C.'s enforcement guidelines.  In discussing employers' vicarious liability, the guidelines state that "[a]n individual qualifies as an employee's 'supervisor' if: (a) the individual has authority to undertake or recommend tangible employment decisions affecting the employee; or (b) [t]he individual has authority to direct the employee's daily work activities."  EEOC Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors, 8 FEP Manual (BNA) 405:7654 (1999) (emphasis in original).  This Court is not bound by the E.E.O.C.'s guidelines, but they receive this Court's respect to the degree that they are persuasive.  *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (agency interpretations of ambiguous statutes, contained in "enforcement guidelines . . . lack the force of law" but are "entitled to respect ... to the extent that those interpretations have the power to persuade") (citation and internal quotation marks omitted).  For the aforementioned reasons, the Court finds this interpretation to be persuasive.

Under this definition, Hughes was Stayner's supervisor.  Based on the deposition testimony of Warden Sheets, 50% of Hughes's activities as sergeant included directing and

15

coordinating the activities of corrections officers when the alleged conduct took place. Defendants assert, however, that Hughes was not a supervisor because he did not discipline or evaluate, and was a member of the same union as the corrections officers.  On the contrary, this case is directly analogous to *Mack*, and thus this Court follows the Second Circuit's holding in that case, and finds that Hughes was in fact Stayner's supervisor.

### iii. Whether Stayner Suffered an Adverse Employment Action

Having determined that Hughes was Stayner's supervisor, this Court must next determine whether Stayner suffered an adverse employment action.  The Supreme Court has defined an adverse employment action as "a significant change in employment status, such as discharge, demotion, or undesirable reassignment."  *Ellerth*, 524 U.S. at 761.  According to the Sixth Circuit, "[u]nder this standard, a "materially adverse" change in employment conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Mitchell v. Vanderbilt University*, 389 F.3d 177, 182 (6th Cir. 2004) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993)).  Factors to consider include: "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."  *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir. 1996) (quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993)).  Stayner certainly may have suffered as a result of Hughes's actions.  She experienced serious psychological traumas, was required to take time off of work, and was forced use up her vacation time.  Nevertheless, these are not *employment* actions, and thus do not meet the required standard.  Accordingly, ODRC can assert an affirmative defense.

### iv. ODRC's Affirmative Defense

As explained above, in situations in which the Plaintiff has not suffered an adverse employment action, the employer may raise a two-pronged affirmative defense to vicarious liability.  The employer must show: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 137 (2004) (quoting *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

Defendants assert that they responded promptly and efficiently to Stayner's report of the alleged harassment, and thus exercised reasonable care.  ODRC states that it promptly separated the two employees from working in the same area, seized Hughes's computers, and searched his office.  It conducted an investigation, interviewed employees, and undertook a forensic investigation of Hughes's computer hard drives.  As a result of the investigation, ODRC decided to discipline Hughes.  Believing that the two-day suspension for a first-time violation of sexual harassment was insufficient, Warden Sheets charged Hughes with two other offenses.  Hughes was terminated.

Hughes filed a grievance, which proceeded to mediation.  The mediator, Dr. Pinkus, advised ODRC and Hughes that ODRC was likely to lose at arbitration because they had chosen to charge Hughes will rules other than that for a sexual harassment violation.  Concerned that they would have to return Hughes to his prior rank as sergeant and pay back-pay, ODRC reached a settlement agreement with Hughes.  Hughes returned to work at RCI, but in a demoted position

and agreed to a two-year Last Chance Agreement.  After Hughes returned, Stayner stated that she did not experience any more harassment from him.

On a superficial level, ODRC's argument is compelling.  Stayner made a complaint. ODRC investigated it, took action, and terminated Hughes.  Pursuant to protocol, Hughes filed a grievance and was reinstated to a lesser position.  There are three glaring holes in this argument, however.  First, ODRC relies on the conclusions of Dr. Pinkus to explain its reinstatement of Hughes, but the reasons behind these conclusions are shrouded in mystery.  It is unclear from the record before the Court who Dr. Pinkus is.  He was not deposed and ODRC did not present any of his reports to the Court.  Second, the substance of the investigation itself is disputed.  ODRC did not investigate any of Stayner's complaints except the 2007 incident.  ODRC asserts that the prior complaints are time-barred, but Stayner has a compelling argument that the incidents are sufficient to make out a continuing violation.  *See Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003) (holding that under the systemic continuing violations theory, discrete discriminatory acts that are part of "longstanding and demonstrable policy of discrimination" toll the statute of limitations).  Thus, even if the prior incidents are now time-barred, that could only be determined *after* an investigation took place.  This never happened.

Third, ODRC's handling of its own policies is inconsistent.  In its motion, it says that it was bound by the two-day suspension for a first-time sexual harassment violation, so this guided its decision-making.  But in his deposition, Warden Sheets said that this two-day suspension was flexible, and a first-time violation of sexual harassment may also result in termination.  ODRC cannot have it both ways.  It cannot argue that it was bound by the terms of its policies, but also claim that its policies are flexible depending on the facts of a particular situation.  In sum, these

18

issues raise a genuine issue of material fact as to whether ODRC took reasonable care to correct Hughes's behavior.  Title VII requires more than an investigation and discipline in name only; there must be substance to those actions.  It is not clear from the record before the Court that there was in this case.  Accordingly, summary judgment as to the sexual harassment claim of Court I is **DENIED**.

## 2. Retaliation

### a. Legal Standard

In order to establish a prima facie case of retaliation, the plaintiff must show that: (1) she engaged in activity protected under Title VII; (2) the defendant knew that she engaged in the protected activity; (3) the defendant subsequently took an adverse, retaliatory action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) the protected activity and the adverse action were causally connected. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  If the employee presents sufficient evidence to make out a prima facie case, the burden shifts to the employer to set forth a legitimate, non-discriminatory reason for the adverse action.  If the employer makes this showing, then the burden shifts back to the plaintiff to produce evidence of pretext.  *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008).

### b. Whether Stayner Suffered an Adverse Employment Action

Stayner cannot make out a prima facie case of retaliation because she cannot show that she suffered an adverse employment action.  In order to support a Title VII retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this case means it well might have dissuaded a reasonable worker

from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 57 (internal quotation marks omitted).

First, Stayner alleges that she suffered an adverse employment action when she took disability leave in 2007. Doctors diagnosed Stayner with post-traumatic stress disorder, depression, and anxiety as a result of the October 2007 incident. On December 21, 2007, she went on paid disability leave. She did not return to work at RCI until her doctors cleared her to do so in September 2008. Second, she alleges that she suffered an adverse employment action when she was placed on administrative leave after making a threat to commit suicide. While on administrative leave, she was paid, but did not receive overtime.

In the context of this case, neither of these actions is an adverse employment action. During both instances, Stayner continued to receive her paycheck and was reinstated to her prior position. By contrast, in *Randloph v. Ohio Dept. of Youth Services*, 453 F.3d 724, 736-37 (6th Cir.), the Sixth Circuit found an adverse employment action when the Department placed the plaintiff on administrative leave, terminated her employment, and reinstated her with only 70% back pay. While Stayner's leave and threat are connected to and perhaps the result of the alleged sexual harassment, the mere fact that the events are connected does not make the events adverse employment actions. *See Dendinger v. Ohio*, 207 Fed. App'x. 521, 527 (6th Cir. 2006) ("We have repeatedly held, however, that neither an internal investigation into suspected wrongdoing by an employee nor that employee's placement on paid administrative leave pending the outcome of such an investigation constitutes an adverse employment action.").

Third, she alleges that being forced to attend training sessions with Hughes and being reassigned with participating in the RTW program were retaliatory actions. Neither of these

actions is retaliatory.  Stayner consented to participating in the training session, and the guidelines of the RTW program mandated her job reassignment.  There is no evidence before the Court that ODRC or RCI applies these guidelines in a discretionary manner.  Accordingly, summary judgment as to the retaliation claim of Court I is **GRANTED**.

### B. Count III (Count II in Amended Complaint): First Amendment

Stayner asserts that the Defendants denied her right to freedom of speech under the First Amendment.  In order to show that she suffered retaliation for speech, a public employee must: (1) establish that her speech was constitutionally protected; and (2) prove that the protected speech was a substantial and motivating factor in the adverse employment action against her. *Mt. Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  If the employee successfully makes this showing, then the burden shifts to the employer to show that it would have taken the same action even in the absence of the protected speech.

In order for this Court to determine if Stayner's speech was protected, it first needs to determine if she "spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410 (2006).  "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for *First Amendment* purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.  If the speech is granted constitutionally protected status, then Stayner must show that the protected speech was a substantial and motivating factor in the adverse employment action against her. *Johnson v. U.S. Dep't of Health & Human Servs.*, 30 F.3d 45 (6th Cir. 1994).

Stayner has not identified how her First Amendment rights have been violated.  Thus, this Court is forced to hypothesize.  She states in her deposition that she wanted to testify at

Hughes' union hearing, but presents no evidence that she was entitled to do within the terms of the collective bargaining agreement.  She also states that she was upset that Finney did not file an EEO complaint on her behalf, but Stayner filed one on her own.  As Stayner has not supported this claim with any evidence, summary judgement as to Stayner's First Amendment claim is **GRANTED**.

### C. Qualified Immunity

### 1. Legal Standards

Stayner brings suit against Sheets and Moore in their official capacity pursuant to § 1983 under an Equal Protection theory, and against Hughes in his official and individual capacity. Defendants sued in their official capacity are not entitled to qualified immunity.  *Kentucky v. Graham*, 473 U.S. 159, 167 (1985).  Thus, qualified immunity is **DENIED** as to Sheets, Moore, and Hughes in their official capacity.

Stayner also brings suit against Hughes in his individual capacity.  The elements needed to recover for a sexually hostile work environment are the same under both Title VII and § 1983. *See Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475, 483 (6th Cir. 1989). Hughes asserts that he is entitled to qualified immunity, and thus Stayner's claims against him in his individual capacity must fail.

According to the doctrine of qualified immunity, "government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity involves the following three-step inquiry:

> *First*, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. *Second,* we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. *Third,* we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.  If the answer to all three questions is "yes," qualified immunity is not proper.

*Champion v. Outlook Nashville, Inc*., 380 F.3d 893, 901 (6th Cir. 2004) (citations omitted).  The

Court need not consider these questions in a particular order.  *Pearson v. Callahan*, 129 S. Ct.

808, 821 (2009) ("[T]here will be cases in which a court will rather quickly and easily decide

that there was no violation of clearly established law before turning to the more difficult question

[of] whether the relevant facts make out a constitutional question at all.").

The second prong requires the Court to determine whether a right was "clearly

established" by examining "whether it would be clear to a reasonable officer that his conduct

was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202.  Because most rights are

"clearly established" at some level of generality, the analysis of whether a right is "clearly

established" must be "undertaken in light of the specific context of the case, not as a broad

general proposition."  *Floyd v. City of Detroit*, 518 F.3d 398, 405 (6th Cir. 2008).  Summary

judgment should be denied if the undisputed facts, taken in the light most favorable to the

plaintiff, show that the defendants violated clearly established rights or if, under the third prong,

there is a factual dispute "such that it cannot be determined before trial whether the defendant

did acts that violate clearly established rights."  *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir.

1988) (citing *Green v. Carlson*, 826 F.2d 647, 650-52 (7th Cir.1987)); *see also Vakilian v. Shaw*,

335 F.3d 509, 515 (6th Cir. 2003) (stating that summary judgment on qualified immunity

grounds is improper "if genuine issues of material fact exist as to whether the officer committed

acts that would violate a clearly established right"); *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) ("Where, as here, the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability.  This is especially true considering that the District Court must view the facts in the light most favorable to the plaintiff on a motion for summary judgment.") (internal citations omitted).

### 2. Application

The outcome in this case will depend on which facts the jury credits.  If the jury finds that Hughes's behavior violated a constitutional standard, as he conceded was possible at oral argument, then qualified immunity is improper.  If the jury finds that it did not, then qualified immunity is proper.  This is a matter for the jury, not the Court, and thus an award of qualified immunity is improper at this time.  Summary judgment is **DENIED** as to Hughes's request for qualified immunity.

### D. Individual Liability of Hughes under Title VII

Stayner seeks compensation from Hughes pursuant to his individual capacity under Title VII.  The Sixth Circuit has held, however, that individuals cannot be held personally liable for damages under Title VII.  *Wathen v. General Elec. Co.*, 115 F.3d 400, 404–05 (6th Cir. 1997). Accordingly, summary judgment is **GRANTED** as to Stayner's claims against Hughes in his individual capacity under Title VII.  As explained *supra*, Hughes is individually liable for Stayner's claims under 42 U.S.C. § 1983.

### V. CONCLUSION

For the foregoing reasons, summary judgment in **GRANTED** in part and **DENIED** in part.  Summary judgement is **DENIED** as to Stayner's sexual harassment claim.  Summary

judgment is **GRANTED** as to Stayner's retaliation and First Amendment claims.  Summary judgment is **DENIED** as to the request of Hughes, Sheets, and Moore for qualified immunity.  Summary judgment is **GRANTED** as to Stayner's claims against Hughes in his individual capacity under Title VII.  The suit may proceed against Hughes, Sheets, and Moore in their official capacities and against Hughes in his individual capacity.

     **IT IS SO ORDERED.**

                    **s/Algenon L. Marbley**           
                    **ALGENON L. MARBLEY**
                    **UNITED STATES DISTRICT COURT**

**Dated: September 6, 2011**